HIGDON FOOD SERVICE, INC. and Kentucky Foods Corporation (A wholly owned subsidiary of Higdon Food Service, Inc.), Movants,

v.

Gene WALKER and Kesterson Meat Company, Inc., Respondents.

Supreme Court of Kentucky.

Nov. 23, 1982.

Thomas B. Russell, Whitlow, Roberts, Houston & Russell, Paducah, for movants.

John Reed, McMurry & Livingston, Paducah, for respondents.

PALMORE, Justice.

The movant, Higdon Food Service, Inc. (hereinafter Higdon), and a subsidiary corporation brought this suit against the respondents, Gene Walker and his employer, Kesterson Food Company, Inc. (hereinafter Kesterson), to enforce a noncompetition covenant contained in a written employment agreement between Higdon and Walker. The trial court entered a judgment enjoining Walker and Kesterson. The Court of Appeals in a divided opinion reversed on the ground that Walker "received nothing by signing the contract. There was neither mutuality of obligation nor other consideration to him ... We therefore conclude that the promises of the appellant contained in the contract are unenforceable." Our conclusion is that the contract was good and the judgment correct.

Higdon is a wholesale grocery company. Kesterson is one of its competitors. Higdon employed Walker in 1974 as a warehouseman and truck driver. Some time thereafter Walker was made a salesman and was given a route. At the end of February, 1981, Walker quit his job with Higdon and went to work for Kesterson at a higher salary. Meanwhile, he had gained knowledge with respect to Higdon's business and customers that would be detrimental to Higdon for its competitors to have. Kesterson was advised of Walker's contract with Higdon when it hired him. Walker was to sell for Kesterson in the same area and call on many of the same customers as he had for Higdon.

For the first four years of Walker's work with Higdon there was no written contract of employment. The agreement in question was signed in August of 1978. At the same time similar agreements were signed by all of Higdon's other sales and supervisory personnel, some 15 in number, except for one, who left his employment. The occasion for Higdon's having such a contract prepared and signed was that the management had heard of an instance in Texas in which one competing company had raided another by hiring roughly half of its sales force. There is no evidence to the effect that Walker or any of Higdon's other employees were expressly told that signing the contract was a condition of their continued employment with Higdon, but as Walker himself testified, "they didn't put it where you'd be fired or anything, but I took it that if I didn't sign it I probably ... I wouldn't be there long either."

That portion of the contract sought to be enforced in this proceeding provided in substance that at no time during the employment or within one year immediately thereafter would Walker "for himself or on behalf of any other person, within any regularly routed area of sales and services of Employer, open a business which would be a competitor, or engage as an agent of any competitor, or call upon or accept inquiries or calls from any customer of the Employer for the purpose of soliciting or diverting such customer to any competitor of Employer," ... etc.

It is not vital that we spell out the other terms of the contract in great detail. The gist of Walker's position is that it really was a one-way street, providing certain protections for Higdon but nothing for Walker that he did not already have. Central to this theme is the argument that he was still a mere servant at will, subject to being discharged at any time for any or no reason. We are unable to accede to this proposition.

In the first place, whatever may have been the employment arrangement before, it was succeeded and superseded by the contract. In this respect it was the same as a new employment. Higdon was under no more of an obligation to continue or renew the employment than Walker was. The hiring itself (or rehiring, if one prefers that word) was sufficient consideration for the conditions agreed to by Walker. It makes no difference that Higdon could have discharged him the next day. The point is that it did not have to hire him—or keep him on—at all.

Actually, however, one-sided as it was, we think Walker did acquire something more under the contract:

Paragraph 2.03 provided that the employment "shall continue only as long as the services rendered by the Employee are satisfactory to the Employer, regardless of any other provision contained in this agreement. The Employer shall be the sole judge as to whether the services of the Employee are satisfactory."

Paragraph 6.01 (styled "Events Causing Termination"), on the other hand, provided in pertinent part as follows:

"This employment shall terminate on the occurrence of any one of the following events:

.    .    .    .    .

"(5) Whenever the Employer in good faith determines that the services of Employee are no longer satisfactory to the Employer or are no longer needed by Employer."

The majority opinion of the Court of Appeals treated paragraph 6.01 as simply *insuring* "that employment will be discontinued if it becomes unsatisfactory. Significantly, it does not provide that employment would be continued if it is satisfactory." We are unable to accept such a strained construction of the contract. If the employer has an arbitrary right to discharge the employe—that is, in good faith or bad— what earthly function would it serve to add that if in good faith he determines that the employe's work is not satisfactory he will fire him? We think, rather, that the sensible solution is to construe paragraphs 2.03 and 6.01 together as meaning that the employer's right to discharge the employe on the ground that his services are not satisfactory, or are no longer needed, is subject *to the requirement of good faith.* We are confident that Walker would be the first to espouse such a view if this were a suit against Higdon for wrongful termination of the employment.

Throughout Walker's brief and the majority opinion of the Court of Appeals we encounter the much abused and oft-misused expression "lack of mutuality." The only question in this case is whether the contract was supported by consideration running from the employer. Under its express terms Higdon "hereby employs" Walker "as a sales representative" and agrees to pay him according to a schedule of commissions. The hiring was the consideration running from Higdon, and it supports all of the obligations accepted by Walker. Even if it could have been terminated unilaterally at the unfettered will of the employer, it was nevertheless a contract under which rights and obligations existed prior to its termination, and for breach of which there was a remedy at law. Cf. *Louisville Cycle & Supply Co., Inc. v. Baach,* Ky., 535 S.W.2d 230, 233 (1976). "It is not necessary that each clause of a contract carry with it a specific consideration. It is sufficient if the overall agreement has a consideration. Nor does a contract lack mutuality because the obligation undertaken on one side is not commensurate with that undertaken on the other." *Hamrick v. City of Ashland,* Ky., 321 S.W.2d 401, 403 (1959).

In *Crowell v. Woodruff,* Ky., 245 S.W.2d 447 (1952), this court voiced misgivings with respect to a similar contract but nevertheless assumed it to be valid prima facie, choosing instead to withhold relief in the name of balancing equities:

"The fairness of the transaction and its freedom of any taint of oppression is always a matter of consideration in weighing the right of a party to the aid of the court ... The inequity of the plaintiff's plea for specific performance lies in the fact that having exacted the harsh covenant, *he discharged his employee within a brief time.*" 254 S.W.2d at p. 450 (emphasis added).

The inequitable circumstance on which Powell v. Woodruff turned does not exist in this case. To the contrary, it was Walker himself who terminated the employment in order to earn more compensation elsewhere and who now seeks to repudiate the contract after having worked under it for 2½ years. Although we need not so decide, it seems to us that under the principles of equity he might very well be estopped.

The decision of the Court of Appeals is reversed and the judgment of the trial court is affirmed.

All concur.