135 F.3d 1069
 Darlene A. FORSYTHE, Individually and as Administrator of
the Estate of Thomas Lewis Forsythe, Deceased,
Plaintiff-Appellant,
v.
BANCBOSTON MORTGAGE CORPORATION; John Doe No. 1 Through No.
10, Defendants-Appellees.
 No. 96-5073.
 United States Court of Appeals,
Sixth Circuit.
 Argued March 14, 1997.
Decided Dec. 3, 1997.*
 
 Karen L. Stewart, Louisville, KY, Jeffrey M. Duban (argued and briefed), Law Offices of Jeffrey M. Duban, New York City, for Plaintiff-Appellant.
 Robert W. Griffith (briefed), James W. Proud (argued and briefed), Stites & Harbison, Louisville, KY, for Defendants-Appellees.
 Before: JONES, SUHRHEINRICH, and SILER, Circuit Judges.
 OPINION
 NATHANIEL R. JONES, Circuit Judge.
 
 
 1
 The plaintiff, Darlene Forsythe, appeals from a summary judgment for the defendant, BancBoston Mortgage Corporation ("BancBoston"). Forsythe sued on behalf of herself and the estate of her husband, Thomas Forsythe, for breach of contract, breach of implied covenant of good faith, breach of fiduciary duty, and intentional infliction of emotional distress. There are two issues presented on appeal: whether the district court properly found that Mrs. Forsythe had signed a valid release, whereby she promised not to sue BancBoston; and whether the district court properly granted summary judgment on the Thomas Forsythe estate's claims. For the reasons that follow, we affirm summary judgment on both issues.
 
 I.
 
 2
 On August 15, 1986, Darlene and Thomas Forsythe, citizens of Kentucky, executed a real estate mortgage with Singleton Mortgage Corporation. Under the terms of the loan, the Forsythes were to pay monthly principal and interest payments on the loan. The Forsythes were also required to pay an additional monthly amount that would be held in escrow to fund the annual insurance premiums, special assessments, and property taxes. At the original closing, the settlement agent estimated these costs. The agent's estimates were in actuality lower than the payments required to service the mortgage. The Forsythes dutifully made their regular payments in the amount of $437.24, the amount estimated by the settlement agent. Consequently, for the years of 1986, 1987, and 1988, the amount of funds contributed to escrow by the Forsythes was lower than that needed to service the mortgage.
 
 
 3
 Two weeks after originating the Forsythes' mortgage, Singleton Mortgage Corporation transferred its interest to Rhode Island Hospital Trust Mortgage Service Corporation ("RIHT"). RIHT then began servicing the Forsythes' mortgage and administered their escrow account. In August 1988, BancBoston acquired RIHT's interest in the Forsythe mortgage through a merger of BancBoston and RIHT. Through the merger, BancBoston acquired all assets and liabilities of RIHT.
 
 
 4
 In December 1988, 28 months after the Forsythes' loan originated, BancBoston analyzed their escrow account. This was the first time that the Forsythes' account was ever reviewed.[1] After BancBoston determined that the account had incurred a shortage of $1,155.22, it informed the Forsythes that their monthly payment would increase by $124.97 for the next twelve months, in order for BancBoston to recover the shortage amount.
 
 
 5
 Not surprisingly, the Forsythes were shocked when they received notice of their increased payment obligations. They immediately inquired as to the reasons for the increase and why BancBoston and its predecessors had waited 28 months to perform an analysis of their account. BancBoston replied in two letters, each of which explained how the shortage in the Forsythes' escrow account arose. The Forsythes, however, apparently could not afford to pay this new amount and BancBoston refused to accept partial payments.
 
 
 6
 Consequently, in June 1989, BancBoston commenced foreclosure proceedings against the Forsythes. In October 1989, the Forsythes filed for bankruptcy, and the bankruptcy court granted them relief. The bankruptcy court ordered Thomas Forsythe's wages to be garnished and that a portion of this money be used to pay BancBoston. During this period, the Forsythes made their payments at the pre-increase amount. BancBoston accepted these monthly installments as partial payments and notified the Forsythes that payments of less than the increased amount would be treated as partial payments until the remainder of the amount due was received.
 
 
 7
 On April 10, 1990, Thomas Forsythe committed suicide. Six months later, BancBoston filed a second foreclosure proceeding against plaintiff Darlene Forsythe. The parties then entered negotiations to settle the foreclosure action. On June 18, 1992, BancBoston and Mrs. Forsythe, each represented by counsel, entered into a settlement agreement. The agreement provided that when Mrs. Forsythe paid BancBoston $8,000.00, the mortgage would be deemed current. BancBoston waived the $9,222.99 it claimed as past due and paid the Mrs. Forsythe's attorney fees in the amount of $1,071.00. BancBoston also dismissed the foreclosure action without prejudice. Finally, the Mrs. Forsythe signed a release, which stated in pertinent part:
 
 
 8
 IT IS HEREBY AGREED that Forsythe, her heirs or assigns, has (sic) agreed to never institute any action at law or equity against BancBoston, nor institute, prosecute, or in any way aid in the institution or prosecution of any claim, demand, action, or cause of action for damages, costs, loss of services, expenses or compensation for or on account of any damage, loss or injury to either person or property or both, whether known or unknown, and that Forsythe further releases BancBoston, its successors or its assigns, its employees, officers and attorneys from any liability arising out (sic) any alleged errors that may have occurred in the analysis of Forsythe's escrow account with BancBoston.
 
 
 9
 (emphasis added).
 
 
 10
 On September 10, 1993, Mrs. Forsythe filed this diversity action on behalf of herself and the estate of her deceased husband alleging that BancBoston made no attempt to explain the reasoning for the mortgage increase, failed to accept payments of the pre-increase amount from the Forsythes, forced the Forsythes into bankruptcy, improperly commenced two foreclosure actions, caused Thomas Forsythe to commit suicide, and otherwise outrageously and maliciously wreaked havoc on the Forsythes. All of Mrs. Forsythe's claims relate to conduct that occurred prior to the signing of the release. Both parties submitted motions for summary judgment based on these facts. On April 1, 1994, the district court found that the release was valid and granted summary judgment for the defendant as to Forsythe's individual claims. The district court, however, denied summary judgment on the claims raised by the estate of Thomas Forsythe.
 
 
 11
 Following the district court's decision, discovery proceeded on the remaining claims. BancBoston then moved for summary judgment on Thomas Forsythe's estate's claims, and in December 1995, the district court granted BancBoston's motion for summary judgment. This appeal followed.
 
 II.
 
 12
 This court reviews a district court's grant of summary judgment de novo, applying the same test as the district court in reviewing a motion for summary judgment. Barnhart v. Pickrel, Schaeffer & Ebeling Co., 12 F.3d 1382, 1388 (6th Cir.1993). We are therefore bound to grant summary judgment when no issues of material fact are present and the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c).
 
 III.
 
 13
 We first consider whether the district court properly granted summary judgment in favor of the defendant as to Mrs. Forsythe's claim that she was entitled to summary judgment upon her motion because the release was 1) unconscionable, 2) against public policy, and 3) lacking in consideration. Each of these arguments will be addressed in turn.
 
 A.
 
 14
 Forsythe argues that the settlement agreement is unconscionable for two reasons. First, Forsythe claims that the release, by its terms, was so one-sided as to be unconscionable. Second, Forsythe alleges that the release is unconscionable because it bars all future claims between the parties. We disagree.
 
 
 15
 "[T]he notion of 'unconscionability' is an elusive one." Louisville Bear Safety Serv., Inc. v. South Central Bell Tel. Co., 571 S.W.2d 438, 439 (Ky.Ct.App.1978). An unconscionable contract is a contract " 'which no man in his senses, not under delusion, would make, on the one hand, and which no fair and honest man would accept, on the other.' " Id. (quoting Black's Law Dictionary 1694 (4th ed.1976)). The doctrine of unconscionability is only used in rare instances, such as when a party abuses its right to contract freely. See Id. (quoting Wille v. Southwestern Bell Tel. Co., 219 Kan. 755, 549 P.2d 903 (1976)). Further, due to the fact-sensitive nature of unconscionability determinations, courts consider such claims on a case-by-case basis. See e.g. Wickliffe Farms, Inc. v. Owensboro Grain Co., 684 S.W.2d 17 (Ky.Ct.App.1984) (applying Kentucky version of the Uniform Commercial Code to find that force majeure clause unfavorable to the plaintiff was not unconscionable). The doctrine forbids only one-sided, oppressive, and unfairly surprising contracts, and not mere bad bargains. Louisville Bear Safety Service, Inc., 571 S.W.2d at 439.
 
 
 16
 The terms of the release, though harshly applied by BancBoston, were not unconscionable. Mrs. Forsythe was represented by counsel when she negotiated and signed the settlement. BancBoston reduced her amount due to $8,000.00 and waived more than $9,000 in past due payments. Upon payment of the $8,000, BancBoston agreed that Mrs. Forsythe would have been held in good standing. Finally, BancBoston paid her attorney fees, dismissed the forfeiture action without prejudice and, thus, allowed her to remain in ownership of her home. Based on these facts, this court does not find this contract to be unconscionable, nor is it a contract that "no man in his senses ... would make." Id. To the contrary, it appears that the waiver of amounts past due did benefit Mrs. Forsythe.
 
 
 17
 Further, the release is not unconscionable due to the provision barring all future claims between the parties. We agree with the district court finding that alleged transgressions of BancBoston did not trigger the clause governing future claims because the injuries alleged by Forsythe occurred prior to the signing of the release. Having no post-release conduct comprising any portion of the alleged injury to Mrs. Forsythe, the district court correctly reserved the issue of the validity of the clause for another day.
 
 B.
 
 18
 Forsythe also argues that the district court should have set aside the release because it violates public policy. However, the longstanding rule governing this theory of recovery demands that this court only grant relief if the agreement injures the public or is against the public good. City of Princeton v. Princeton Elec. Light & Power Co., 166 Ky. 730, 179 S.W. 1074, 1078 (1915). Courts should be hesitant to allow parties to escape their obligations under "the pretext of public policy or illegality." Zeitz v. Foley, 264 S.W.2d 267, 268 (Ky.Ct.App.1954). Forsythe has not alleged a specific public policy controverted by enforcement of the release, only that a favorable ruling for BancBoston "is harsh to [the] appellant and unreasonably favorable to BancBoston."[2] However, it is clear that Kentucky public policy favors resolution of lawsuits through settlement. See Floyd v. Carlisle, 758 S.W.2d 430, 431 (Ky.1988) ; Nix v. Jordan, 532 S.W.2d 762, 763 (Ky.Ct.App.1975). Therefore, we hold that Forsythe's public policy argument fails.
 
 C.
 
 19
 Finally, Mrs. Forsythe argues that the release fails for want of consideration. Mrs. Forsythe, however, received substantial consideration for signing the release and reducing her obligation to $8,000.00--her attorney's fees were paid, she kept her house, and BancBoston agreed to make her mortgage current subject to her payment.
 
 
 20
 Forsythe argues that the consideration was illusory because BancBoston only dismissed its forfeiture action without prejudice. However, Kentucky courts have long held that consideration is deemed proper where a party relinquishes its right to engage in an activity or practice that it would otherwise have been legally entitled to perform. See Central Adjustment Bureau, Inc. v. Ingram Associates, Inc., 622 S.W.2d 681, 684-85 (Ky.Ct.App.1981) (upholding validity of employment contract containing covenant not to compete); Higdon Food Service v. Walker, 641 S.W.2d 750, 752 (Ky.1982) (at will contract of employment not lacking in consideration, because "[e]ven if it could have been terminated unilaterally at the unfettered will of the employer, it was nevertheless a contract under which rights and obligations existed prior to its termination, and for breach of which there was a remedy at law."). The fact that BancBoston maintained its right to renew the action against Forsythe does not diminish, for consideration purposes, its withdrawal of the earlier suit for benefits received under the release. Thus, we find that the consideration supporting the release was sufficient.
 
 IV.
 
 21
 We now consider whether the district court properly granted summary judgment in favor of BancBoston on the claims of Thomas Forsythe's estate. Mrs. Forsythe, on behalf of the estate, claims that BancBoston 1) breached the mortgage contract, 2) breached an implied covenant of good faith and fair dealing, 3) engaged in outrageous conduct, and 4) breached its fiduciary duty. We address each argument below.
 
 A.
 
 22
 Mrs. Forsythe argues that the mortgage imposed implied duties upon BancBoston to accept partial payments and, alternatively, to provide a yearly analysis of the escrow account to warn of any underpayment. However, the mortgage clearly states the terms of payment and does not require BancBoston to accept partial payment:
 
 
 23
 Any deficiency in the amount of any such aggregate monthly payment shall, unless made good by the Mortgagor prior to the due date of the next such payment, constitute an event of default under this mortgage.
 
 
 24
 and
 
 
 25
 If ... such monthly payments shall not be sufficient to pay such items when the same shall become due and payable then the Mortgagor shall pay to the Mortgagee as trustee, any amount necessary to make up the deficiency, within thirty (30) days after written notice from the Mortgagee stating the amount of the deficiency, which notice may be given by mail.
 
 
 26
 We conclude, as the district court did, that the contract is unambiguous in its requirement that Forsythe was required to pay BancBoston a sum equal to the principal plus interest and the taxes, special assessments, and taxes due on the property (i.e., the sum of the principal, interest and cost of the escrow account obligations).
 
 
 27
 Mrs. Forsythe points out that BancBoston did accept partial payments while Mrs. Forsythe was in bankruptcy. BancBoston's acceptance of these payments as partial payments, contrary to the assertion of Mrs. Forsythe, however, do not evidence bad faith. While BancBoston could have accepted partial payments as full payments under the mortgage, it was not obligated to do so. The absence of bad faith is further demonstrated by the fact that BancBoston permitted the Forsythes to spread the cost of their escrow shortage over a year, rather than the thirty days stipulated in the mortgage. While BancBoston could have been more accommodating in its dealings with Forsythes, its hard-nosed conduct, however distasteful, was valid under the mortgage.
 
 
 28
 Additionally, Mrs. Forsythe argues that BancBoston breached the mortgage contract because it had an obligation to analyze the escrow account annually. Nothing in the mortgage contract provides that BancBoston must analyze the escrow account annually. See Hendrix v. Fireman's Fund Ins. Co., 823 S.W.2d 937, 941 (Ky.Ct.App.1991) (holding that courts should not read terms into contract that the contract does not contain). Plaintiff argues that standard practices in the mortgage industry are such that escrow accounts are reviewed annually. Even if this court were inclined to review such evidence of standard industry practices, however, the issue was not raised before the district court and is therefore waived.
 
 B.
 
 29
 Next, Mrs. Forsythe claims that BancBoston breached the implied covenant of good faith and fair dealing. Under Kentucky law, every contract has an implied covenant of good faith and fair dealing. Ranier v. Mount Sterling Nat'l Bank, 812 S.W.2d 154, 156 (Ky.1991). The covenant imposes upon banks the duty to act in a "bona fide" manner. Pearman v. West Point Nat'l Bank, 887 S.W.2d 366, 368 (Ky.Ct.App.1994). In Pearman, the Kentucky Court of Appeals looked to Black's Law Dictionary for a definition of "bona fide" which means: "[i]n or with good faith; honestly, openly, and sincerely; without deceit or fraud.... Truly; actually; without stimulation or pretense. Innocently; in the attitude of trust and confidence; without notice of fraud, etc. Real, actual, genuine, and not feigned." Id. at 368 n. 3 (quoting Black's Law Dictionary 177 (6th ed.1990)). Mrs. Forsythe has not presented any evidence that BancBoston did not act in a "bona fide" manner.
 
 
 30
 While there is no question that BancBoston could have been more lenient with Mrs. Forsythe, such conduct was not mandated by law. BancBoston provided the Forsythes opportunities to comply with the contract with no legal obligation to do so. We therefore conclude that BancBoston acted in a bona fide manner as it is defined by law and did not breach the implied covenant of good faith and fair dealing.
 
 C.
 
 31
 Mrs. Forsythe further argues that BancBoston engaged in outrageous conduct. "A Kentucky law permits a breach of contract action to yield tort damages when the breach involved 'outrageous conduct'...." Innes v. Howell Corp., 76 F.3d 702, 713 (6th Cir.1996) (citing Audiovox Corp. v. Moody, 737 S.W.2d 468, 469-71 (Ky.Ct.App.1987)). In order for Mrs. Forsythe to prevail under this theory, however, this court must find that the mortgage was breached by BancBoston. Id. at 713. If there is no finding of a breach, then the argument fails. Id. Having found no breach in this case, we find that the requirements of the outrageous conduct claim have not been satisfied.[3]
 
 D.
 
 32
 Finally, Mrs. Forsythe, as administrator of Thomas Forsythe's estate, claims that BancBoston owed and breached a fiduciary duty to her as holder of the escrow funds. Specifically, Mrs. Forsythe claims the duty arose because BancBoston held the escrow funds "in trust." A fiduciary relationship exists when the "relationship is one founded on trust or confidence reposed by one person in the integrity and fidelity of another and which also necessarily involves an undertaking in which a duty is created in one person to act primarily for another's benefit in matters connected with such undertaking." Steelvest, Inc. v. Scansteel Serv. Ctr., Inc., 807 S.W.2d 476, 485 (Ky.1991). However, a close examination of Kentucky contract law reveals that this claim is not legally justified.
 
 
 33
 "[T]he great weight of authority is that while the relationship between a mortgagor and mortgagee is often described as one of trust, technically it is not of a fiduciary character." Lovell v. Western Nat'l Life Ins. Co., 754 S.W.2d 298, 303 (Tex.Ct.App.1988); see also Hush v. Reaugh, 23 F.Supp. 646, 651 (E.D.Ill.1938); Baumgard v. Bowman, 31 Ohio App. 266, 167 N.E. 166, 166-67 (1928). Mrs. Forsythe has not shown that Kentucky would depart from this authority. In fact, Kentucky treats mortgage contracts as any other contracts, see Yudkin v. Avery Fed. Sav. & Loan Ass'n, 507 S.W.2d 689, 690 (Ky.Ct.App.1974), and like other contracts, mortgage contracts need an express provision to create such a relationship. Thus, there is no fiduciary duty between the parties.
 
 V.
 
 34
 For the foregoing reasons, the grant of summary judgment to the defendant is AFFIRMED.
 
 
 
 *
 This decision was originally issued as an "unpublished decision" filed on December 3, 1997. On January 21, 1998, the court designated the opinion as one recommended for full-text publication
 
 
 [1]
 Usually RIHT would analyze Kentucky mortgages in February, however, it did not analyze the Forsythes' account in 1987 because it believed the mortgage was too new--less than six months old. RIHT claims it did not analyze the Forsythes' account in February 1988, because the Forsythes were in default. In April 1988, the Forsythes paid their missed payments, and a RIHT employee requested an analysis of the Forsythes' escrow account. RIHT did not perform the analysis, because of a "clerical error." BancBoston then acquired RIHT in August 1988. BancBoston performs analysis of Kentucky loans in December, and thus, the mortgage was finally analyzed in December 1988
 
 
 [2]
 We can only infer that the ground for Mrs. Forsythe's public policy claim is that BancBoston should not be allowed to bar all future claims between the parties. However, as we have established, the case before us does not invoke that clause because the injuries alleged took place prior to the signing of the release
 
 
 [3]
 Moreover, even if the court found a breach in this case, it would be difficult to find outrageous conduct. Outrageous conduct must be beyond "all possible bounds of decency." Roush v. KFC Nat'l Mgt. Co., 10 F.3d 392, 401 (6th Cir.1993). Mrs. Forsythe has not presented evidence that BancBoston's conduct meets this standard
 Mrs. Forsythe's attempt to link Thomas Forsythe's suicide as proof of BancBoston's outrageous conduct is an extremely tenuous argument. The record suggests several factors that may have contributed to his death, including alcoholism, work pressure and parental stress. While there is no doubt that filing bankruptcy and the possibility of losing his home put Mr. Forsythe under more pressure, Mrs. Forsythe has not sufficiently linked this occurrence to his suicide. Even so, it does not follow a fortiori that BancBoston's conduct was "outrageous."