CHARLES T. CREECH, INC., Appellant

v.

Donald E. BROWN and Standlee Hay Company, Inc., Appellees

and

Donald E. Brown and Standlee Hay Company, Inc., Appellants

v.

Charles T. Creech, Inc., Appellee.

Nos. 2012–SC–000651–DG, 2012–SC–000693–DG.

Supreme Court of Kentucky.

June 19, 2014.

---

[2]. Thus, to the extent consistent with this opinion, we grant Spencerian's "motion to dismiss appeal."

Caroll Morris Redford, III, Don Arlie Pisacano, Elizabeth C. Woodford, Miller, Griffin & Marks, P.S.C., Counsel for Appellant/Appellee Charles T. Creech, Inc.

David R. Irvin, James M. Mooney, Moynahan, Irvin & Mooney, P.S.C., Counsel for Appellee/Appellant Standlee Hay Company, Inc.

Jon Allen Woodall, Brendan Reynolds Yates, Ryan Colleen Daugherty, McBrayer, McGinnis, Leslie, & Kirkland, PLLC, Counsel for Appellee/Appellant Donald E. Brown.

David Lindsay Leightty, Benjamin S. Basil, Priddy, Cutler, Miller 86 Meade, PLLC, Counsel for Amici Curiae Greater Louisville Building and Construction Trades Council; International Brotherhood of Electrical Workers, Local 369; Kentucky AFL–CIO; Kentucky Jobs with Justice; Teamsters Local 783; United Auto Workers; and United Steelworkers of America.

Opinion of the Court by Justice KELLER.

Standlee Hay Company, Inc. (Standlee), Donald E. Brown (Brown), and Charles T. Creech, Inc. (Creech) filed separate appeals from an opinion by the Court of Appeals reversing the trial court's summary judgment in favor of Brown and Standlee. Because the issues raised on appeal arise from the same facts, we address both appeals herein. Having reviewed the record and the arguments of the parties as well as the arguments by *amici curiae*—Greater Louisville Building and Construction Trades Council; International Brotherhood of Electrical Workers,

Local 369; Kentucky AFL–CIO; Kentucky Jobs with Justice; Teamsters Local 783; United Auto Workers; and United Steelworkers of America (collectively the Unions)-we reverse the Court of Appeals.

## I. FACTS.

The parties have conducted little, if any, discovery in this matter; therefore, we take our facts, most of which are not in dispute, from the parties' pleadings and the attachments to those pleadings.

Creech is engaged in the business of providing hay and straw to farms throughout Kentucky.[1] Brown worked for Creech for eighteen years as a driver, dispatcher, and salesperson. In the summer of 2006, the daughter of Charles Creech, Creech's President, circulated a "Conflicts of Interests" agreement (the Agreement) for signature by Creech's employees. On July 20, 2006, Charles Creech asked Brown to sign the Agreement, which Brown did. We note that Brown states that, when Charles Creech presented him with the Agreement, he said that Brown needed to sign it in order to "get [Creech's] daughter off our backs." Creech stated that Brown signed the Agreement in consideration for his continued employment. The Agreement provided in pertinent part as follows:

All proprietary information will be held in strict confidence. As an employee of Creech, Inc. you will have access to sensitive company, customer and supplier information. Such information has been obtained through the over 25 years that the company has been in business and is, therefore, the property of Creech, Inc. If at any time, either during employment or after leaving the company,

you share such information with competitors of [sic] other third parties, Creech, Inc. reserves the right to pursue all legal avenues to recoup damages as well as legal fees accrued in such legal action from the employee or former employee.

The industries that Creech, Inc. operates within are highly competitive. We require that all employees agree and understand that after leaving the company they are not permitted to work for any other company that directly or indirectly competes with the company for 3 years after leaving Creech, Inc. without the companies [sic] consent.

Failure to comply with this policy during employment may result in immediate termination. In the event an employee or former employee violates this policy, the company will prosecute to the fullest extent of the law, including the recoup of legal expenses incurred during such prosecution, if it deems that its interests were not protected or appropriately respected by any of its employees.

I, *Donnie Brown,* understand and agree to abide by the above agreement, and if I know of any non-compliance with the agreement, I will report it to management in a timely fashion.

Brown signed the Agreement but no one from or on behalf of Creech signed the Agreement. No one from Creech told Brown that his continued employment was contingent on his signing the Agreement, and he did not receive any monetary consideration for signing the Agreement.[2]

Shortly after Brown signed the Agreement, Creech transferred him from his job as salesperson to the job of dispatcher.

---

1. There is some indication in the record that Creech sells hay and straw in other states and/or countries. However, Creech's customers in Kentucky are the only customers at issue.

2. During oral arguments, counsel for Creech stated that the Agreement was part of an employee handbook. However, that handbook is not part of the record.

This job change did not involve any change in salary but did result in Brown having decreased responsibilities and little to no direct customer contact.

In mid-November 2008,[3] Brown resigned from Creech to take a job with Standlee, a producer and seller of hay and straw. According to Brown, before taking the job with Standlee, he met with Charles Creech and explained that the Standlee job would include selling Standlee's products to farm managers and others in Kentucky and surrounding states. Charles Creech agreed that he had a conversation with Brown about the Standlee job. However, Charles Creech stated that Brown said that he would only be selling Standlee products to "big box stores," a market in which Creech does not participate.

On November 13, 2008, counsel for Creech sent correspondence to Brown reminding him of the Agreement that he "signed when [he] became an employee of Charles T. Creech, Inc." Counsel indicated that, based on representations Brown made to Charles Creech, Creech was willing to waive the Agreement "only insofar as it prevents you from being employed by Standlee." Creech was not willing to waive any other provisions of the Agreement. Specifically, Creech demanded that Brown not use "any proprietary information gained during [his] employment with . . . Creech to benefit the business pursuits of Standlee." This prohibition included any disclosure of Creech's "client information, supplier information, business models, finances, business plans, or any other company records or company information" obtained by Brown during his employment with Creech.

On November 17, 2008, counsel for Standlee sent correspondence to counsel for Creech indicating that Standlee wanted to "make sure there are no misunderstandings about what [Standlee] expect[ed] from Mr. Brown." By way of explanation, counsel for Standlee stated that Standlee intended "to set up a new LLC in Kentucky to deal with that end of their operations and that Mr. Brown [would] be an employee of this new LLC." Brown would "act as a salesman . . . contacting any and all of the horse farms in Kentucky and the surrounding states, in an effort to sell Standlee Hay products to those potential customers." While Brown "may well contact people who [had] previously been customers of" Creech, he would not "focus on any customer due to the fact that they may have been customers of" Creech. It was Standlee's intent "to give Mr. Brown the list of horse farms in Kentucky, and the surrounding states, and to then send him out to contact these farms." As to proprietary information, counsel assured Creech that Standlee had its own practices and policies and had no interest in any such information Brown might have. Finally, counsel asked for "your thoughts on these matters after you have reviewed this letter." When no response to that letter was forthcoming, Standlee hired Brown, and Brown began selling Standlee hay and straw in Kentucky.

According to Charles Creech and a Creech employee, in January 2009 they heard from several of Creech's customers that Brown had contacted them on behalf of or sold them hay from Standlee. Charles Creech also stated that Standlee had "stolen" two of Creech's warehouse employees and that Brown had contacted one of Creech's suppliers. Brown offered Affidavits disputing some of the conten-

---

**3.** In his Affidavit, Brown says that he resigned on November 17. In his Affidavit, Charles Creech says that Brown resigned on November 14. The exact date of Brown's resignation is irrelevant to our analysis.

tions made by Charles Creech in his Affidavit. In particular, the supplier stated that he contacted Brown and one of the former Creech employees stated that he contacted Standlee after he had been fired by Creech. The other former employee stated that he demanded a raise and when Creech refused to give him one, he quit, and he then contacted Brown.

On February 16, 2009, Creech filed suit against Brown and Standlee, seeking compensatory and punitive damages and injunctive relief. In its complaint, Creech alleged that: the Agreement constituted a contract between Brown and Creech; Brown had breached that contract; Standlee had intentionally interfered with the contract between Creech and Brown; Standlee induced or aided and abetted Brown in breaching his contract with Creech; and Standlee intentionally interfered with Creech's existing and prospective business contracts. Creech sought compensatory and punitive damages and injunctive relief. Creech later amended its complaint to add allegations of common law fraud and breach of confidentiality.

Simultaneously with its initial complaint, Creech filed a motion for a temporary injunction, seeking to enjoin Brown and Standlee from directly or indirectly competing with Creech; from interfering with or contacting any of Creech's existing or potential customers; and from using any of Creech's trade secrets and confidential or proprietary information.

Standlee and Brown filed motions to dismiss Creech's complaint and responses to Creech's motion for injunctive relief. In its response/motion, Standlee argued that Creech waived any objection to Brown's employment in the November 13, 2008 letter. Furthermore, Standlee argued that, to the extent the November 13, 2008 letter did not waive any objection to Brown's employment, Creech's failure to respond to the November 17, 2008 letter waived any and all objections to Brown's employment.

In his response/motion, Brown argued that: he had not obtained any proprietary information while working for Creech; customer names and contact information were public information; he had received no consideration for signing the Agreement; Creech violated the Agreement when it transferred him from his job as a salesman to a job as a dispatcher; and the Agreement was void because it contained no geographical limitation.

In its reply, Creech argued that the failure to set out a geographical limitation was not fatal because Brown knew the extent of Creech's business and the court could supply a reasonable geographical limitation. Furthermore, Creech argued that any waiver in the November 13 letter was not a knowing waiver because Brown told Charles Creech that he would only be selling to "big box stores." Finally, Creech argued that it had no duty to respond to the November 17, 2008 letter; therefore, its failure to do so could not equitably estop Creech from enforcing the Agreement.

The court conducted several hearings on the parties' motions and ultimately issued a temporary injunction on May 5, 2009. In doing so, the court found that: Brown's continued employment by Creech constituted consideration for the Agreement; Brown had obtained confidential and proprietary information while employed by Creech; Brown provided confidential and proprietary information to Standlee and both of them used that information in direct competition with Creech; Creech did not directly or indirectly waive the terms of the Agreement; Creech would suffer immediate and irreparable harm absent injunctive relief; the court had the equitable power to provide a geographical limitation; a reasonable geographical limitation

was the Commonwealth of Kentucky; and, with that modification, the Agreement was enforceable. Based on those findings, the court enjoined Brown from directly or indirectly competing with Creech and from using or disclosing information regarding Creech's customers.

Creech then filed a motion "to Confirm Compliance with Court's Temporary Injunction." In that motion, Creech argued that Brown continued to work for Standlee, which Creech believed violated the injunction. Both Brown and Creech filed responses to that motion admitting that Brown was employed by Standlee but stating that Brown was not working in a sales position. They both also filed in chronological order: notices of appeal, appealing the court's issuance of the injunction to the Court of Appeals;[4] answers to Creech's amended complaint; counterclaims against Creech; and Kentucky Rule of Civil Procedure (CR) 65.07 motions for interlocutory relief in the Court of Appeals. Creech then filed answers to the counterclaims and a motion for summary judgment as to Brown's counterclaims. Standlee then filed a motion for clarification of the injunction.

The trial court held a hearing on June 24, 2009 and, on July 7, 2009, entered an order clarifying the injunction by stating that Brown: could continue to work for Standlee but he could not sell hay to any party in Kentucky; could not purchase hay from any party in Kentucky; could not purchase hay from any party outside of Kentucky for delivery to a party in Kentucky; and could not disclose any information he had obtained during his employment with Creech.

The Court of Appeals entered an Order Granting CR 65.07 Relief the same day the trial court entered its order of clarification.[5] In its Order, the Court of Appeal's held that the trial court abused its discretion when it issued the temporary injunction. In doing so, the Court noted the following problems with the Agreement: it contained no geographical limitation, making it appear to be an unenforceable covenant in restraint of trade; Brown had been employed by Creech for 16 years before Creech presented him with the Agreement; Creech had not presented any evidence that it had expended any time, effort, energy, or money to train Brown; and Creech presented insufficient evidence to support its claim that Brown had obtained proprietary information. Creech then filed a CR 65.09 motion from the Court of Appeals's order, which this Court denied.

Following this Court's denial of Creech's CR 65.09 motion, both Standlee and Brown filed motions for summary judgment. In their motions, they essentially argued that, based on the Court of Appeals's order granting CR 65.07 relief, summary judgment was appropriate. Creech responded, arguing that the Court of Appeals's order was not binding and that case law supported its position. The trial court held a hearing on the summary judgment motions in February 2011 and entered an order granting both motions on March 28, 2011.[6]

4. The Court of Appeals ultimately dismissed both appeals as improperly taken from a non-final order.

5. The Court of Appeals issued a corrected order on July 10, 2009, correcting a typographical error and granting Standlee's motion to be dismissed as a party, which it had failed to address in the July 7, 2009 order. The corrected order did not change the result.

6. The trial court initially entered orders granting Standlee's motion for summary judgment on March 4, 2011 and Brown's motion for summary judgment on March 10, 2011. Because the two orders created some procedural confusion, the court vacated them and

On April 4, 2011, Creech filed a notice of appeal from that order.[7]

The Court of Appeals reversed the trial court's summary judgment. In doing so, the Court proposed a six factor test that should be applied by the trial court in determining whether the non-compete portion of the Agreement is enforceable.[8] The Court held that the parties were entitled to conduct additional discovery and that the trial court had to review Creech's claims in light of that six factor test. The Court also held that, as a matter of law, Brown's continued employment with Creech constituted sufficient consideration to support the Agreement. Finally, the Court held that the parties were entitled to additional discovery regarding Creech's alleged waiver of the Agreement. Creech, Brown, and Standlee sought discretionary review of the Court's opinion, which we granted.

## II. STANDARD OF REVIEW.

 The standard of review on appeal of a summary judgment is whether the circuit judge correctly found that there were no issues as to any material fact and that the moving party was entitled to a judgment as a matter of law." *Pearson ex rel. Trent v. Nat'l Feeding Sys., Inc.*, 90 S.W.3d 46, 49 (Ky.2002). Summary judgment is only proper when "it would be impossible for the respondent to produce any evidence at the trial warranting a judgment in his favor." *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.*, 807 S.W.2d 476, 480 (Ky.1991). In ruling on a motion for summary judgment, the Court is required to construe the record "in a light most favorable to the party opposing the motion . . . and all doubts are to be resolved in his favor." *Id.* at 480. A party opposing a summary judgment motion cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must present affirmative evidence in order to defeat a properly supported motion for summary judgment. *Id.* at 481.

## III. ANALYSIS.

In its appeal, Creech argues that: the trial court prematurely granted summary judgment; the trial court's reliance on the Court of Appeals's CR 65.07 opinion was erroneous; it adequately preserved issues related to the nondisclosure portion of the Agreement and the Court of Appeals erred by not addressing those issues; and the six factor test in the Court of Appeals's opinion is not supported by Kentucky law and will create significant and unintended consequences. In their appeal, Brown and Standlee argue that: the Agreement is an unenforceable restraint on trade; the Agreement is fatally flawed because it contains no geographical limitation; the trial court impermissibly reformed the Agreement by providing a geographical limitation; and Brown did not receive adequate consideration in exchange for signing the Agreement. The Unions argue that non-compete agreements in an employment setting should be treated differently from those involving the sale of a business; con-

---

issued an order granting both motions on March 28, 2011.

7. We note that, prior to filing its notice of appeal, Creech filed a motion to correct a clerical error in the trial court's March 28, 2011 order. The trial court entered an order correcting that error on April 11, 2011. Creech then filed an amended notice of appeal to include the April 11, 2011 order.

8. The Court of Appeals noted that the Agreement contains both a non-compete provision and a non-disclosure provision. However, the Court held that Creech had failed to properly preserve any arguments regarding the non-disclosure provision; therefore, the Court refused to address that provision.

tinued employment is not adequate consideration to support a non-compete agreement; the benefits of restrictive covenants in employment situations do not outweigh the equitable deficits; and employees are equitably disadvantaged by such covenants presented once employment has begun. Because we hold that this Agreement was not supported by adequate consideration, that is the only issue we address.

Various definitions of consideration are found in the text books and judicial opinions. In *Luigart v. Federal Parquetry [Parquatry] Mfg. Co.*, 194 Ky. 213, 238 S.W. 758, 760 [ (1922) ], the term "consideration" is thus defined: "A benefit to the party promising, or a loss or detriment to the party to whom the promise is made. 'Benefit,' as thus employed, means that the promisor has, in return for his promise, acquired some legal right to which he would not otherwise have been entitled. And 'detriment' means that the promisee has, in return for the promise, forborne some legal right which he otherwise would have been entitled to exercise."

*Phillips v. Phillips*, 294 Ky. 323, 171 S.W.2d 458 (Ky.1943).

■ Creech argues that Brown's continued employment was sufficient consideration to support the Agreement. In support of its argument, Creech relies primarily on two cases—*Higdon Food Service, Inc. v. Walker*, 641 S.W.2d 750 (Ky. 1982) and *Central Adjustment Bureau, Inc. v. Ingram Associates, Inc.*, 622 S.W.2d 681 (Ky.App.1981). Both cases are distinguishable and neither is dispositive.

In *Higdon*, Walker began working for Higdon Food Service (Higdon) in 1974 and worked there for four years without an employment contract. 541 S.W.2d at 751. In 1978, Higdon presented Walker with an employment contract stating that "Higdon 'hereby employs' Walker 'as a sales representative' and agrees to pay him according to a schedule of commissions." *Id.* at 752. The contract also provided that Walker could only be discharged if Higdon determined in good faith that it no longer needed his services, or if Higdon determined in good faith that his services were not satisfactory. *Id.* Finally, the contract contained a non-compete clause. *Id.* Walker testified that he was not threatened with loss of his job if he did not sign the contract. However, Walker believed he would have been fired if he had not done so. *Id.* at 751.

In 1981, Walker quit his job with Higdon and went to work for one of Higdon's competitors. Higdon sued to enforce the non-compete provision of the contract, and the trial court found in Higdon's favor. *Id.* at 751. The Court of Appeals reversed, finding that Higdon had not provided any consideration to Walker in exchange for his signature on the contract. *Id.*

This Court reversed. In doing so, the Court noted that the contract, which spelled out Walker's position and compensation, altered the terms of the employment relationship and "was the same as a new employment." *Id.* at 751. Because Higdon was not compelled to keep Walker as an employee or to "rehire" Walker, the fact that it did so was sufficient consideration to support the contract. *Id.* at 752.

Furthermore, the Court held the provision that Walker could only be discharged if Higdon found in good faith that his work was unsatisfactory or that he was no longer needed, created "rights and obligations . . . for breach of which there was a remedy at law." *Id.* The creation of these rights and obligations was sufficient consideration to support the contract. *Id.* at 752.

None of the preceding factors are present here. Creech offered nothing to Brown in exchange for his signature on the Agreement except to get Charles Creech's daughter "off their backs." Creech did not, by way of the Agreement, hire or rehire Brown because the Agreement, unlike the non-compete provision in *Higdon*, was not part of an employment contract. Furthermore, the Agreement cannot be construed as Creech "hiring" or "rehiring" Brown because the Agreement does not contain any of the indicia of an employment contract, *i.e.* it does not state what job Brown would be doing or what salary or wages Brown would be paid. In other words, the Agreement did not alter the terms of the employment relationship between Creech and Brown and was not "the same as new employment." Thus, Creech did not provide consideration to Brown by hiring or rehiring him based on his acceptance of the Agreement.

Furthermore, Creech did not promise Brown that he could only be discharged following a good faith finding by Creech that his work was unsatisfactory or that his services were no longer needed. As noted during oral arguments, immediately before Brown signed the Agreement, Creech was entitled to fire him for any reason or no reason and immediately after Brown signed the Agreement, Creech was entitled to fire him for any reason or no reason. Unlike the employment contract in *Higdon*, which created rights and imposed obligations on both parties, the Agreement herein imposed obligations on Brown—to maintain confidentiality and to refrain from working for a competitor for three years after resigning—but did not provide Brown with any rights. Furthermore, the Agreement gave Creech the right to protect certain assets and to keep Brown from seeking alternative employment but imposed no obligations on Creech. Because the Agreement did not

require Creech to forbear the exercise of some legal right or otherwise result in some detriment to Creech, there was no consideration.

In *Central Adjustment Bureau, Inc. v. Ingram Associates, Inc.*, Central Adjustment Bureau (Central) provided collection services to customers throughout the United States. 622 S.W.2d. at 683. Central's business depended on "satisfactory personal contact between its sales and collection employees and its clients." *Id.* Central hired H. Preston Ingram on March 1, 1971, and he signed a covenant not to compete on March 22, 1971. Central hired Kathleen Garrison on September 8, 1975, and she signed a covenant not to compete on November 12, 1975. Central hired David Powers on April 1, 1975, and he signed a covenant not to compete on May 15, 1975. In 1979, all three employees resigned from Central and started a competing collection service company. *Id.*

Central filed suit seeking to enforce the covenants. The trial court found that the covenants were not enforceable because the employees had been advised that, if they did not sign, they would be fired. The court was not convinced Central's continued employment of the three following that threat was sufficient consideration to support the covenants. *Id.*

The Court of Appeals reversed. In reversing, the Court of Appeals noted several factors that indicated there had been sufficient consideration. First, the Court noted that all three employees signed the covenants shortly after they started working for Central. Second, the Court noted that all three employees continued to be employed for a number of years. Third, the Court noted that all three employees received raises and promotions while employed at Central. Fourth, the Court noted that, after signing the covenants, all

three employees "acquired specialized knowledge, training, and expertise in the collection business which they might not have otherwise acquired." *Id.* at 686. These factors led the Court to conclude that, if there was no consideration when the covenants were signed, there was when the employees resigned. *Id.* Thus, Creech's argument to the contrary notwithstanding, the fact that Central permitted the employees to continue working after they signed the covenants was not the only factor the Court considered in determining the sufficiency of consideration.

Furthermore, this case differs considerably from *Central Adjustment Bureau* in at least five crucial ways. First, in *Central Adjustment Bureau,* the employees signed the covenants within several weeks to several months after being employed. Here, Brown had worked for Creech for sixteen years before he signed the Agreement. Second, after the employees in *Central Adjustment Bureau* signed the covenants, which they did early in their employment, they acquired specialized knowledge, training, and expertise they would not have otherwise acquired. Here, it is undisputed that Brown had significant experience in the hay business before he began working for Creech. While there is evidence that Brown obtained information regarding Creech's customers during the sixteen years he worked for Creech before signing the Agreement, there is no evidence that Creech provided any specialized training or expertise to Brown during that time period. Furthermore, unlike in *Central Adjustment Bureau,* there is no evidence that Brown gained any specialized knowledge, training, expertise, or customer information after he signed the Agreement. Third, Creech did not give Brown any raise during the months he worked after signing the Agreement. Fourth, Creech did not promote Brown but took away responsibility and, while not decreas-

ing his salary, arguably demoted him. Finally, Creech, unlike Central, did not threaten Brown with loss of his job if he did not sign the Agreement.

There is a common thread running through both *Higdon* and *Central Adjustment Bureau*—after the non-compete provision was signed, whether as part of a larger employment contract or as a standalone document, the employment relationship between the parties changed. In *Higdon,* Walker became more than simply an at-will employee. In *Central Adjustment Bureau,* the employees received specialized training as well as promotions and increased wages. After Brown signed the Agreement his employment relationship with Creech did not change. He remained an at-will employee with no promotion, no increase in wages, and no specialized training. In short, Brown received no consideration from Creech in exchange for signing the Agreement or after he signed the Agreement. Therefore, the Agreement is not enforceable.

Based on the preceding, we need not address the other issues raised by the parties.

## IV. CONCLUSION.

For the foregoing reasons, we reverse the Court of Appeals and reinstate the trial court's summary judgment in favor of Brown and Standlee.

All sitting. MINTON, C.J.; ABRAMSON, CUNNINGHAM, SCOTT and VENTERS, JJ., concur. NOBLE, J., concurs in result only by separate Opinion.

NOBLE, J., Concurring in Result.

I believe the preliminary question in this case is what Creech would have done if Brown had refused to sign the non-compete agreement. The implication is that with the daughter insisting on the agree-

ment, Brown would have been let go from his employment. Thus it seems that continued employment was consideration, and as a matter of law we do not question the sufficiency of it on appeal. If there was consideration, then my view is that the trial court would not get to apply the blue pencil rule. That leaves the "agreement" lacking a material term (area) and thus the agreement fails. I think the majority view is a very restrictive read on consideration that will require employers to struggle to get an enforceable noncompete agreement. Consequently, I concur in result only.