Am. Air Filter Co. v. Price, 2017 NCBC 54.

<table>
<tr><td>

STATE OF NORTH CAROLINA

COUNTY OF WAKE

AMERICAN AIR FILTER
COMPANY, INC. d/b/a AAF
International,

              Plaintiff,

v.

SAMUEL C. PRICE, JR. and
CAMFIL USA, INC. d/b/a CAMFIL
AMERICAS,

              Defendants.

</td><td>

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
16 CVS 13610

**OPINION AND ORDER ON
DEFENDANTS' MOTION TO DISMISS
PLAINTIFF'S FIRST AMENDED
COMPLAINT**

</td></tr>
</table>

THIS MATTER comes before the Court on Defendants Samuel C. Price, Jr.'s ("Price") and Camfil USA, Inc.'s d/b/a Camfil Americas ("Camfil") (collectively, "Defendants") Motion to Dismiss ("Motion to Dismiss").

THE COURT, after considering the Motion to Dismiss, the briefs in support of and in opposition to the Motion to Dismiss, the arguments of counsel at the hearing, and other appropriate matters of record, concludes that the Motion to Dismiss should be GRANTED, in part, and DENIED, in part, for the reasons set forth below.

> *Young Moore and Henderson P.A. by Christopher A. Page, Esq., Jonathan L. Crook, Esq., for Plaintiff American Air Filter Company, Inc. d/b/a AAF International.*

> *Smith Moore Leatherwood, LLP by George J. Oliver, Esq., Jeffrey R. Whitley, Esq., for Defendants Samuel C. Price, Jr. and Camfil USA Inc. d/b/a Camfil Americas.*

McGuire, Judge.

<u>FACTUAL AND PROCEDURAL BACKGROUND</u>

1. The Court does not make findings of fact on motions to dismiss under Rule 12(b)(6) of the North Carolina Rules of Civil Procedure (N.C. Stat. § 1A-1, Rule 12(b)(6) (hereinafter the "Rule(s)"), but only recites those facts included in the Complaint that are relevant to the Court's determination of the Motion. *See e.g., Concrete Serv. Corp. v. Inv'rs Grp., Inc.*, 79 N.C. App. 678, 681, 340 S.E.2d 755, 758 (1986).

2. Plaintiff American Air Filter, Inc. ("AAF") is a Delaware corporation with its principal place of business in Louisville, Kentucky. It "maintains operations" in Wake County, North Carolina. (VFAC ¶ 1.)[1] AAF manufactures and services clean air products and equipment for commercial buildings, data centers, healthcare facilities, food and beverage, microelectronics, and schools and universities.

3. Camfil is a direct competitor of AAF. Camfil also does business in North Carolina, including Wake County.

4. Price is a resident of Johnston County, North Carolina, and a former employee of AAF. Price is currently employed with Camfil.

A. <u>AAF's confidential business information</u>.

5. AAF's "business is driven by relationships with its customers." (VFAC ¶ 8.) AAF has made significant investment in developing and enhancing customer relationships and in obtaining and compiling a substantial body of what it alleges is

---

[1]References to the allegations contained in the Verified First Amended Complaint, filed by AAF on December 5, 2016, are denoted "VFAC."

"confidential and proprietary information and trade secrets . . . critical to its ability to serve existing and prospective" customers.  (VFAC ¶¶ 11, 12.)

6. AAF maintains web-based tools called "Sales Playbook" and "Salesforce.com" in which it compiles confidential and proprietary information used in its sales efforts.

7. AAF also has a proprietary program called Total Cost of Ownership Diagnostics ("TCOD"). (VFAC ¶ 17.) TCOD provides technical data about AAF products and competitors' products based on AAF's internal and third-party testing and performance studies. TCOD also calculates the costs of ownership of AAF's products as compared to competitors' products.

8. AAF alleges that "[t]he specific trade secrets accessible through these programs include," *inter alia*: "secret and highly sensitive company-wide prices that AAF corporate officers negotiated on behalf of AAF with its national accounts"; "quoting tools that use proprietary algorithms to create custom quotes that incorporate prices AAF negotiated with national accounts, AAF's custom discounts, and customer-specific needs"; "audit reports created by AAF sales professionals at the physical location of customer facilities which include identification of customers' current air filtration products, sizes, specifications, and customer-specific issues or talking points developed by AAF sales professionals"; "information on the costs of goods sold that could allow calculation of AAF profit margins"; "technical specifications and data that resulted from extensive internal and third-party product

testing and performance studies"; and "detailed drawings and product specifications created by AAF for new customer construction projects." (VFAC ¶ 18.)

9. All three databases are password-protected, requiring an employee to log in with a username and password. As an additional security measure, information in Sales Playbook cannot be downloaded or printed.

10. AAF immediately disables employee access to its databases upon the employee's notice of resignation or termination from AAF, or if the employee indicates that he or she is going to work for a competitor. (VFAC ¶¶ 25—26.)

B. Price's employment with AAF and the 2006 Agreement.

11. In December 1989, AAF hired Price as Branch Manager for territories consisting entirely of counties in North Carolina. (VFAC ¶¶ 28, 30.) Price was "responsible for leading and managing a sales team to achieve monthly, quarterly, and annual revenue goals, as well as growing sales and profitability in [his] assigned territory." (VFAC ¶ 29.) Price remained Branch Manager until his resignation from AAF on August 12, 2016. During his employment, Price had full access to, was trained to use, and regularly relied on Sales Playbook, Salesforce.com, and TCOD to perform his job duties.

12. As a condition of employment, AAF required Price to sign employment agreements which set out the respective rights and responsibilities of Price and AAF in relation to Price's employment with the company, the first of which was executed on December 11, 1989. Thereafter, AAF periodically entered into new agreements

with Price that "altered Price's and AAF's respective rights and responsibilities." (VFAC ¶ 42.)

13. On November 13, 2006, AAF and Price entered into a written "Sales Representative Employment Agreement" ("the 2006 Agreement"). (VFAC ¶ 43, Ex. B; hereinafter, "2006 Agreement.") This was the final written employment agreement between AAF and Price. In exchange for the 2006 Agreement, AAF provided Price with a 3.5% salary increase and a materially different Sales Quota and Contribution Margin Target ("Margin Target").

14. The 2006 Agreement contained a covenant not to compete that read as follows:

> If the Employee terminates this Agreement or Company terminates this Agreement for cause, then in either event, for a period of one (1) year after such termination, Employee will not either on Employee's own behalf or on behalf of any other person, firm, corporation or other entity, either directly or indirectly, (a) contact, for the purpose of diverting, any of Company's customers or the Accounts; (b) solicit the trade of, or trade with any of Company's customers of the Accounts/Territory; (c) engage in any Competitive Business with the Accounts/Territory; (d) seek to cause any person, firm or corporation with whom the Employee came in contact as a representative of Company to refrain from doing business in whole or in part with or through Company; or (e) solicit or induce any employee, current or future, of Company, to leave Company or to work for another individual.

(2006 Agreement § 6.1.)

15. The 2006 Agreement states that the "Accounts/Territory" from which Price willd be restricted under the covenant is "set out on Exhibit B" to the

Agreement, but no Exhibit B was included with or attached to the 2006 Agreement. (2006 Agreement § 1.1.)

16.     The 2006 Agreement commenced on November 13, 2006, and was for a term of one year. (2006 Agreement § 5.1.) The 2006 Agreement states that it "shall automatically renew for successive one (1) year terms unless terminated[.]" (*Id*.) AAF alleges "Price received consideration for each renewing year of the 2006 Agreement in the form of base salary, commission and or/bonus," but does not allege that Price's salary or bonuses were increased in conjunction with the alleged renewals. (VFAC ¶ 50.)

C.     Price's resignation from AAF and employment with Camfil.

17.     On July 24, 2016, unbeknownst to AAF, Price accepted employment with Camfil. (VFAC ¶¶ 53–54.)

18.     On August 5, 2016, Price submitted his notice of resignation from AAF effective at close of business on August 12, 2016. Price told AAF managers that he was retiring from the air filtration industry and would not be joining a competitor. (VFAC ¶ 52.) In reliance on Price's representations, AAF permitted Price to continue accessing its databases from August 5 until August 12, 2016. AAF alleges that had Price told AAF that he was going to work for Camfil, AAF would have revoked Price's access to its databases and trade secrets immediately. (VFAC ¶¶ 56–58.)

19.     Price commenced his employment with Camfil sometime shortly after August 12, 2016.  Price is employed as a Branch Manager for Camfil in North and

South Carolina performing "substantially the same duties" as he had with AAF. (VFAC ¶ 72.)

20.     Price accessed Salesforce.com at least three times after accepting employment with Camfil; attended a training seminar on the TCOD on or around August 1, 2016 during which he accessed TCOD; and, acquired knowledge of the algorithms and code used to create TCOD by receiving answers to detailed questions he asked of AAF's in-house developer of TCOD. (VFAC ¶¶ 60–63.)

21.     In late August 2016 AAF learned that Price was working for Camfil. AAF sent a letter to Camfil's Executive Vice President, Armando Brunetti ("Brunetti") to inform Camfil of Price's continuing obligations under the covenant not to compete and to request that Camfil refrain from inducing Price to breach the covenant. Brunetti confirmed that Camfil had hired Price and that Price had sent four emails to customers he had previously serviced at AAF. AAF requested that Price immediately cease employment with Camfil, refrain from contacting AAF customers and disclosing confidential information.

22.     AAF alleges that "several customers have contacted AAF to alert them that Price was soliciting business from them on behalf of Camfil." (VFAC ¶ 78.) The VFAC does not allege that AAF has lost any customers as a result of Price's or Camfil's conduct or that Camfil has used any specific AAF confidential information or trade secrets. AAF does not allege any specific economic injury or damages, but alleges only that "AAF has suffered and will continue to suffer substantial irreparable injury and actual damages." (VFAC ¶¶ 88, 95, 101, 115, 120, and 126.)

23. AAF initiated this action by filing a Complaint on November 4, 2016. AAF amended its Complaint by filing the VFAC on December 5, 2016. In the VFAC, AAF makes claims against Price for breach of contract (Count I) and breach of fiduciary duty (Count II); a claim against Camfil for tortious interference with contract (Count III); and claims against both Price and Camfil for misappropriation of trade secrets in violation of the North Carolina Trade Secrets Protection Act, G.S. § 66-151, et seq. ("NCTPA") (hereinafter, references to the North Carolina General Statutes will be to "G.S.") (Count IV), violation of the North Carolina Unfair and Deceptive Trade Practices Act. G.S. § 75.1 et seq. ("UDTPA") (Count V), and civil conspiracy (Count VI).

24. On January 17, 2017, Defendants filed the Motion to Dismiss. The Motion was fully briefed, the Court has heard oral arguments, and it is now ripe for disposition.

## DISCUSSION

A. Rule 12(b)(6) Standard.

25. In ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court's inquiry is "whether, as a matter of law, the allegations of the complaint, treated as true are sufficient to state a claim upon which relief may be granted under some legal theory, whether properly labeled or not." *Harris v. NCNB Nat'l Bank*, 85 N.C. App. 669, 670, 355 S.E.2d 838, 840 (1987). Our appellate courts frequently reaffirm that North Carolina is a notice pleading state. *See, e.g., Feltman v. City of Wilson*, 238 N.C. App. 246, 252, 767 S.E.2d 615, 620 (2014) (quoting *Wake Cty. v. Hotels.com, L.P.*,

762 S.E.2d 477, 486 (N.C. Ct. App. 2014)) ("Under notice pleading, a statement of claim is adequate if it gives sufficient notice of the claim asserted to enable the adverse party to answer and prepare for trial, to allow for the application of the res judicata, and to show the type of case brought.")).

26.     In deciding a motion under Rule 12(b)(6), the Court construes the Complaint liberally and accepts all allegations as true. *Laster v. Francis*, 199 N.C. App. 572, 577, 681 S.E.2d 858, 862 (2009). However, the Court is not required "to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Good Hope Hosp., Inc. v. N.C. Dep't of Health & Human Servs.*, 174 N.C. App. 266, 274, 620 S.E.2d 873, 880 (2005). In addition, the Court may consider documents which are the subject of the complaint and to which the complaint specifically refers, including the contract that forms the subject matter of the action. *Oberlin Capital, L.P. v. Slavin*, 147 N.C. App. 52, 60–61, 554 S.E.2d 840, 847 (2001).

27.     Dismissal of a claim pursuant to Rule 12(b)(6) is proper "(1) when the complaint on its face reveals that no law supports plaintiff's claim; (2) when the complaint reveals on its face the absence of fact sufficient to make a good claim; [or] (3) when some fact disclosed in the complaint necessarily defeats the plaintiff's claim." *Oates v. JAG, Inc.*, 314 N.C. 276, 278, 333 S.E.2d 222, 224 (1985). Otherwise, "a complaint should not be dismissed for insufficiency unless it appears to a certainty that plaintiff is entitled to no relief under any state of facts which could be proved in support of the claim." *Sutton v. Duke*, 277 N.C. 94, 103, 176 S.E.2d 161, 166 (1970).

B. Choice of Law.

28. The parties dispute whether the law of North Carolina or Kentucky governs the contract and tort claims raised in the VFAC. AAF has its principal place of business and corporate headquarters in Louisville, Kentucky. On the other hand, AAF brought this lawsuit in North Carolina, and Price worked for AAF, and currently works for Camfil, in North Carolina. In addition, virtually all of the conduct underlying the claims occurred in North Carolina. The Court will first consider the choice of law questions.

*i. Breach of Contract.* [2]

29. AAF claims Price breached the 2006 Agreement. The 2006 Agreement contains a choice of law provision that states that "[t]he construction performance (*sic*) and completion of this Agreement shall be governed by the laws of the State of Kentucky." (2006 Agreement § 7.2.) North Carolina courts generally recognize the validity and enforceability of such provisions unless:

> (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice,

---

[2] Defendants contend that North Carolina law applies to the breach of contract claim, but do not make any argument in support of their contention in their Brief in Support of the Motion to Dismiss. Instead, Defendants state in their brief that they "incorporate the argument that North Carolina law controls the contractual analysis, as briefed in response to Plaintiff's Motion for Preliminary Injunction." (Defs.' Br. Supp. Mot. Dismiss 4, fn. 1.) The General Rules of Practice and Procedure for the North Carolina Business Court ("BCR") do not expressly permit parties to incorporate previously-filed briefs and documents outside of the brief at issue, at least not to supplement the substantive text of the brief at issue. In fact, BCR 7.8 provides strict word limits on briefs submitted to this Court. Even if incorporation of previous briefs were allowable, it appears a party incorporating a previously-filed brief would have to certify under BCR 7.8 that the brief and the incorporated brief did not exceed the word limits. Defendants have not done so in this case. As a result, the Court declines to consider Defendants' arguments and authorities regarding choice of law issues contained in other filings with the Court.

or

> (b) application of the law of the chosen state would be contrary to the fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which . . . would be the state of applicable law in the absence of an effective choice of law by the parties.

*Cable Tel Servs.*, 154 N.C. App. 639, 642–43, 574 S.E.2d 31, 33–34 (quoting Restatement (Second) of Conflict of Laws § 187 (1971)).

30.     AAF maintains a principal place of business in Louisville, Kentucky. Thus, Kentucky has a substantial relationship to this matter and there is a reasonable basis to the parties' choice. *Mosteller Mansion, LLC v. Mactec Eng'g & Consulting of Ga., Inc.*, No. COA07-664, 2008 N.C. App. LEXIS 1011, *9, (May 20, 2008) (finding that Georgia has a substantial relationship to the dispute where a party to the contract maintained its principal place of business in Georgia).

31.     In addition, the Court concludes that the application of Kentucky law would not be contrary to the fundamental policies of North Carolina. "To render foreign law . . . contrary to public policy, it must violate some prevalent conception of good morals or fundamental principle of natural justice or involve injustice to the people of the foreign state[,] [such as involving] prohibited marriages, wagers, lotteries, racing, gaming, and the sale of liquor." *Mosteller*, 2008 N.C. App. LEXIS 1011, at *9 (quoting *Boudreau v. Baughman*, 322 N.C. 331, 342, 368 S.E.2d 849, 857–58 (1988) (citations omitted).

32.     In their reply, Defendants argue that applying Kentucky law would violate public policy because Price did not receive consideration and North Carolina would not enforce a covenant not to compete that was not supported by consideration. (Defs.' Reply Supp. Mot. Dismiss 1.)  In support of this contention, Defendants cite *Cox v. Dine-A-Mate, Inc.*, 129 N.C. App. 773, 501 S.E.2d 353 (1998).  In *Cox*, the Court of Appeals considered the application of a New York choice of law provision contained in a non-compete agreement entered into by a North Carolina employee. The Court applied the "*A.E.P.* test" which provides that "a covenant not to compete violates public policy 'where the sole purpose is to prevent competition rather than protect a legitimate interest of the employer.'" *Cox*, 129 N.C. App. at 778, 501 S.E.2d at 356 (quoting *A.E.P Indus. v. McClure*, 308 N.C. 393, 403, 302 S.E.2d 754, 761 (1983)). The court reasoned that the agreement at issue was executed to prevent competition, rather than to protect the defendant's business interests, because the defendant did not provide consideration to the plaintiff other than continued employment, and because the non-compete covenant lacked a reasonable restriction as to territory. *Id.* at 778, 501 S.E.2d at 356. The court concluded:

> We recognize, however, that the outcome of the consideration test might well be different if examined under New York law . . . . What concerns this Court is that, in a case such as this one, application of New York law would be a violation of North Carolina public policy in that the contract before us falls squarely into the category of an attempt to prevent competition rather than to protect a legitimate interest of the employer.

*Id.*

33.     Finally, the Court in *Cox* held that the non-compete covenant was not intended to serve a legitimate business purpose because the alleged confidential information the defendant's sought to protect through the covenant were not trade secrets.  *Id.* at 780, 501 S.E.2d at 357.

34.     No such fundamental policy concerns exist in this case. Although Kentucky law regarding the enforceability of non-compete covenants differs from North Carolina law in some regards, Kentucky law requires that an enforceable non-compete covenant be supported by consideration other than continued employment, see *Creech v. Brown*, 433 S.W.3d. 345, 353–54, 2014 Ky. LEXIS 233, *20–25 (Ky. Sup. Ct. 2014), and that it have a geographic restriction, *see Hammons v. Big Sandy Claims Serv., Inc.*, 567 S.W.2d 313, 315, 1978 Ky. App. LEXIS 543, *3–4 (1978). In other words, Kentucky law would not permit enforcement of a covenant without consideration.

35.     In addition, the allegations before the Court, including the terms of the 2006 Agreement, do not support the conclusion that the sole purpose of the 2006 Agreement was to prevent competition. As discussed below, AAF has alleged that Price had access to and opportunity to misappropriate AAF's trade secrets. Protecting against the acquisition and use of AAF's trade secrets by competitors is a legitimate business interest.

36.     Because Kentucky has a substantial relationship to the parties and the transaction, and application of Kentucky law does not violate North Carolina public

policy, the Court concludes that Kentucky law applies to AAF's claim for breach of contract.

### ii. *Breach of fiduciary duty, tortious interference, and civil conspiracy.*

37. AAF has also makes tort claims for breach of fiduciary duty, tortious interference with contract, and civil conspiracy. In North Carolina, "[f]or actions sounding in tort, the state where the injury occurred is considered the situs of the claim," or the *lex loci delicti. Harco Nat'l Ins. Co. v. Grant Thronton LLP*, 206 N.C. App. 687, 692, 698 S.E.2d 719, 722–23 (2010) (quoting *Boudreau v. Baughman*, 322 N.C. 331, 335, 368 S.E.2d 849, 853–54 (1988)).

38. AAF alleges that Price breached a fiduciary duty to AAF by lying to AAF about his resignation and plans to work for Camfil, by soliciting his former AAF customers once he joined Camfil, and by using AAF's confidential information and trade secrets inappropriately. (VFAC ¶ 92.) All of this alleged conduct apparently occurred in North Carolina, where Price was employed. At the time Price resigned, his customers were located in North Carolina and South Carolina, and with Camfil, Price is responsible for a territory consisting of North Carolina and South Carolina. (VFAC ¶¶ 30, 72.) Any injury to AAF's customer relationships would have been to those customers he solicited in its sales markets in North Carolina and South Carolina.[3] *Harco*, 206 N.C. App. at 698, 698 S.E.2d at 726 (concluding that the plaintiff had its principal place of business in Illinois, but suffered injury in North Carolina when Department of Insurance seized the plaintiff's funds held in a North

---

[3] Neither party argues that South Carolina law should be applied to any of the claims in this action.

Carolina trust account); *Lloyd v. Carnation Co.*, 61 N.C. App. 381, 387–88, 301 S.E.2d 414, 418 (1983) (applying Virginia law to tort claims where acts were done entirely within Virginia, although defendant, a North Carolina business, was alleged to have wrongfully forced plaintiff out of marketing territory in Virginia, North Carolina, and South Carolina); *Synovus Bank v. Parks*, 2013 NCBC LEXIS 36, *15–17 (N.C. Super. Ct. July 30, 2013) (holding that North Carolina was the place of injury, rather than the complainant's state of residence, where the loss in value of property at issue was located in North Carolina). Accordingly, North Carolina law should be applied to AAF's claim for breach of fiduciary duty.

39.     AAF's third cause of action alleges that Camfil tortuously interfered with the 2006 Agreement by inducing Price to violate his obligations under the agreement. (VFAC ¶¶ 96–101.) Tortious interference requires actual pecuniary harm. *Pinewood Homes, Inc. v. Harris*, 184 N.C. App. 597, 604–05, 646 S.E.2d 826, 832 (2007) (providing the elements of tortious interference with contract). Again, any economic damages stemming from Camfil's alleged interference with the 2006 Agreement arose from injuries to AAF's customer relationships in North Carolina and South Carolina caused by Price allegedly breaching the agreement. Under the *lex loci delicti* test, North Carolina law should be applied to the claim for tortious interference with contract.

40.     AAF's claim against Price and Camfil for civil conspiracy requires AAF to establish "the agreement of two or more parties to carry out the conduct and injury resulting from the agreement." *Toomer v. Garrett*, 155 N.C. App. 462, 483, 574 S.E.2d

76, 92 (2002). Any agreement between Price and Camfil to carry out a wrongful act against AAF was contrived to damage AAF's sales in North Carolina. Again, the only alleged injuries suffered by AAF are to its business in North Carolina, and possibly South Carolina. The Court will apply North Carolina law to the claim for civil conspiracy.

C. <u>AAF has not stated a claim for breach of contract because the VFAC does not allege that the renewals of the 2006 Agreement were supported by consideration</u>.

41.    AAF alleged that Price breached the 2006 Agreement by, *inter alia*, accepting employment with Camfil, soliciting AAF's customers, and disclosing AAF's confidential business information. (VFAC ¶ 87.) Defendants argue that the non-compete provision in the 2006 Agreement is unenforceable because it is not supported by consideration, is overly broad in restricting Price's activities, lacks a geographic scope, and its restrictions on solicitation of AAF's customers are vague and too broad in scope. (Defs.' Br. Supp. Mot. Dismiss 4–12.) The Court concludes that at the time of Price's resignation, the 2006 Agreement was not supported by consideration and, because the 2006 Agreement did not contain a geographic or territorial restriction, it cannot be enforced.

42.    Under Kentucky law, a non-compete covenant entered into by an employee after his initial hiring must be supported by consideration beyond his continued employment. *Charles T. Creech, Inc. v. Brown*, 433 S.W.3d 345, 353–54, 2014 Ky. LEXIS 233, *20–25 (Ky. Sup. Ct. 2014); *Cmty. Ties of Am., Inc. v. NDT Care Servs.*, LLC, No. 3:12-cv-00429-CRS, 2015 U.S. Dist. LEXIS 14990, *53 (W.D. Ky.

Feb. 6, 2015) (citing *Cent. Adjustment Bureau, Inc. v. Ingram Assocs., Inc.*, 622 S.W.2d 681, 685, 198 Ky. App. LEXIS 296, *10–11 (Ky. Ct. App. 1981)) ("As early as 1981, Kentucky law has required that an employment agreements [sic] signed by employees *after the date of his or her initial employment* must be supported by *more* than just continued employment to be enforceable."). In order to constitute consideration, the employment relationship between the parties must change following the signing of a restrictive covenant. *Creech*, 433 S.W.3d at 354, 2014 Ky. LEXIS 233 at *24–25. Such changes could include changing the employee's status from at-will to "for cause" termination, providing the employee a promotion or increased compensation, or providing the employee with specialized training. *Id.*; *Cmty. Ties of Am.,* 2015 U.S. Dist. LEXIS 14990, at *54.

43. In the VFAC, AAF alleges that the 2006 Agreement "was supported by the additional consideration of increased salary of 3.5%, which totaled $1,001.00[,] [in addition to containing] a materially different [Margin Target] compared to [Price's] 2005 Employment Agreement." (VFAC ¶ 46.) These allegations clearly are sufficient to establish that the 2006 Agreement was supported by consideration for the one year term of the agreement from November 13, 2006, through November 12, 2007.

44. The VFAC, however, does not sufficiently allege that Price was provided consideration for the yearly renewals of the 2006 Agreement from 2007 through the end of Price's employment. Instead, AAF alleges only that "Price received consideration for each renewing year of the 2006 Agreement in the form of base

salary, commission and/or bonus." (VFAC ¶ 50.) AAF, however, does not allege that it provided Price with any specific consideration for each yearly renewal. For example, AAF does not allege that it *increased* Price's base salary, commission, or bonuses. AAF does not allege that Price received promotions or any change in job duties in conjunction with yearly renewals. In fact, AAF expressly alleges that Price was employed as a Branch Manager "continuously" from his hire in 1989 "until his resignation on August 12, 2016." (VFAC ¶ 28.)[4]

45.     While AAF alleges that it provided Price with certain training during his employment, it does not allege when such training took place, nor that the training was provided as consideration for Price's promises in the 2006 Agreement or any renewals of the agreement. (VFAC ¶¶ 30, 31, and 34.) The only training that AAF alleges took place after Price executed the 2006 Agreement was a training seminar on the TCOD that Price attended on August 1, 2016. (VFAC ¶ 61.) Again, AAF does not allege that Price received this training in exchange for any non-compete or confidentiality obligations. The allegation that Price received training almost 10 years after the execution of the 2006 Agreement is not sufficient to support a claim that Price received consideration for each of the alleged renewals of that Agreement.

46.     The Court is not required to accept AAF's legal conclusion[5] that Price received "consideration" for the renewals of the 2016 Agreement when there are not facts pleaded in support. *Bunch v. Britton,* No. COA16-181, 2017 N.C. App. LEXIS

---

[4] AAF also alleges that Price's job responsibilities did not change at any time after December 31, 2011. (VFAC ¶ 44.)

[5] Under Kentucky law, whether consideration has been provided is a question of law. *Grass v. Akins,* 368 S.W.3d 150, 153, 2012 Ky. App. LEXIS 79, *7 (Ky. Ct. App. May 25, 2012).

435, *21 (June 6, 2017) ("Although well-pleaded factual allegations of the complaint are treated as true for purposes of a 12(b)(6) motion, conclusions of law or unwarranted deductions of facts are not admitted."). The absence of such factual support is particularly problematic where AAF relies on an agreement that allegedly renewed for successive one-year terms during the last 10 years of Price's employment. Any failure to provide consideration for a given year's renewal would break the "chain" and render the 2006 Agreement unenforceable as to subsequent years. AAF's allegations in the VFAC do not support the notion that AAF provided consideration, or that Price's employment relationship with AAF changed, in exchange for his agreement to renew the non-compete covenant each year after 2006. Defendants' motion to dismiss the claim for breach of contract should be GRANTED, and the claim should be dismissed WITHOUT PREJUDICE.

D. <u>AAF has not alleged facts that support a claim that Price owed AAF a fiduciary duty because Price did not have dominance and influence over AAF</u>.

47. AAF alleges that Price, as Branch Manager, owed it a fiduciary duty of loyalty which obligated him "to act exclusively in AAF's best interests," and that Price breached this duty by, *inter alia*, lying to AAF about his intentions following his resignation, and using AAF's confidential information and trade secrets after his resignation from AAF. (VFAC ¶¶ 90—95.)

48. To sufficiently plead a claim for breach of fiduciary duty, the plaintiff must allege that (1) a fiduciary relationship existed (2) the defendant breached that duty, and (3) the breach proximately caused plaintiff's injury. *BDM Inv v. Lenhill, Inc.*, 2014 NCBC LEXIS 6, *23 (N.C. Super. Ct. Mar. 20, 2014)

49.     "For a breach of fiduciary duty to exist, there must first be a fiduciary relationship between the parties." *Dalton v. Camp*, 353 N.C. 647, 651–52, 548 S.E.2d 704, 707 (2001). A fiduciary relationship may arise when "there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence[.]" *Id.* (quoting *Abbitt v. Gregory*, 201 N.C. 577, 598, 160 S.E. 896, 906 (1931)) (internal quotations omitted). Such a relationship "extends to any possible case in which a fiduciary relationship exists in fact, and in which there is confidence reposed in one side, and *resulting domination and influence on the other*." *Id.* at 652, 548 S.E.2d at 707–08 (quoting *Abbitt*, 201 N.C. at 598, 160 S.E. at 906). "Only when one party figuratively holds all the cards—all the financial power or technical information, for example—have North Carolina courts found that the special circumstance of a fiduciary relationship has arisen." *Lockerman v. South River Elec. Membership Corp.*, 794 S.E.2d 346, 352, 2016 N.C. App. LEXIS 1234, \*11 (2016) (quoting *S.N.R. Mgmt. Corp. v. Danube Partners 141, LLC*, 189 N.C. App. 601, 613, 659 S.E.2d 442, 451 (2008)).

50.     North Carolina's courts have consistently held that an employer-employee relationship is not a fiduciary one, even where the employee has significant management authority, absent some allegation that the employee exercised dominance and control over his employer. *See Austin Maint. Constr., Inc. v. Crowder Constr. Co.*, 224 N.C. App. 401, 410, 742 S.E.2d 535, 542 (2012) (finding no breach of fiduciary duty because "any confidence that AAF reposed in [employee] consisted of

nothing more than relying on him to competently perform his assigned duties"); *Dalton v. Camp*, 353 N.C. at 652, 548 S.E.2d at 708 (quoting *King v. Atl. Coast Line R.R. Co.*, 157 N.C. 44, 62–63, 72 S.E. 801, 808 (1911)) ("Under the general rule, 'the relation of employer and employee is not one of those regarded as confidential.'"); *Reichhold Chems., Inc. v. Goel*, 146 N.C. App. 137, 155, 555 S.E.2d 281, 292 (2001) (finding no fiduciary duty for company vice president because "[a] managerial position alone does not demonstrate the requisite domination and influence on the other"); *Artistic S. Inc. v. Lund*, 2015 NCBC LEXIS 113, *41–43 (N.C. Super. Ct. Dec. 9, 2015) (dismissing fiduciary duty claim against salesperson, noting that allegations of soliciting clients and collecting money did not support finding that employee "held all the cards"); *Allegis Grp., Inc. v. Zachary Piper LLC*, 2013 NCBC LEXIS 12, *32 (N.C. Super. Ct. Feb. 25, 2013) (holding that "basic management responsibilities" do not support fiduciary relationship); *Battleground Veterinary Hosp., P.C. v. McGeough*, 2007 NCBC LEXIS 33, *16 (N.C. Super. Ct. Oct. 19, 2007) ("Even when an employee is entrusted with substantial managerial authority, a fiduciary relationship will not exist absent evidence that such authority led to the employer being subjugated to the 'improper influences or domination of [its] employee.'") (citation omitted).

51. Here, AAF has not alleged that Price held a position of dominance and influence, or "figuratively held all the cards," in his relationship with AAF. To the contrary, the VFAC alleges a garden-variety employment relationship between a management-level employee with sales responsibilities and his employer. The allegations suggest that Price had authority to manage sales employees within

certain territories in North Carolina and perhaps other states, and to sell AAF's products to customers under parameters established by AAF. (VFAC ¶¶ 29; *see generally* 2006 Agreement.) Far from having domination or control over AAF, the 2006 Agreement, which AAF alleges set the terms of Price's employment, gave AAF almost unfettered authority to terminate Price at-will, change his territory and customers, and change his compensation. *Dalton*, 353 N.C. at 652, 548 S.E.2d at 708 ("[A]bsent a finding that the employer in . . . was somehow subjugated to the improper influences or domination of his employee -- an unlikely scenario as a general proposition and one not evidenced by these facts in particular -- we cannot conclude that a fiduciary relationship existed between the two."); *see also DSM Dyneema, LLC v. Thagard*, 2015 NCBC LEXIS 50, *21–22 (N.C. Super. Ct. May 12, 2015) (holding that the plaintiff had failed to allege "the extraordinary or special type of employer-employee relationship that gives rise to a fiduciary duty" because the facts pleaded "failed to allege that Thagard enjoyed the sort of domination or influence over DSM that our courts have found necessary to create a fiduciary duty").

52.     The facts alleged in the VFAC do not support the legal conclusion that Price owed AAF a fiduciary duty. Defendants' motion to dismiss AAF's claim for breach of fiduciary duty should be GRANTED.

E. <u>AAF failed to allege that the 2006 Agreement was valid and enforceable. Accordingly, AAF's claim for tortious interference with contract must fail</u>.

53.     AAF claims that Camfil tortiously interfered with AAF's employment contract with Price, particularly with the non-compete and confidentiality covenants in the agreement. (VFAC ¶¶ 96—101.) To survive a motion to dismiss, AAF must

allege the five elements of tortious interference with a contract: "(1) a valid contract between the plaintiff and a third person, conferring upon the plaintiff some contractual right against the third person; (2) the defendant knows of the contract; (3) the defendant intentionally induces the third person not to perform the contract; (4) the defendant acts without justification; and (5) the defendant's conduct causes actual pecuniary harm to the plaintiffs." *Pinewood Homes,* 184 N.C. App. 597, 604–05, 646 S.E.2d 826, 832 (2007).

54. The Court has concluded that the 2006 Agreement was not valid and enforceable at the time of Price's separation from AAF. Accordingly, AAF's claim for tortious interference with contract must fail, and Defendants' motion to dismiss this claim should be GRANTED.

F. <u>AAF has sufficiently alleged a claim for misappropriation of trade secrets</u>.

55. AAF claims that Price and Camfil misappropriated its trade secrets in violation of the NCTSPA. (VFAC ¶¶ 103–116.)

56. "To plead misappropriation of trade secrets, 'a plaintiff must identify a trade secret with sufficient particularity so as to enable a defendant to delineate that which he is accused of misappropriating and a court to determine whether misappropriation has or is threatened to occur.'" *VisionAIR, Inc. v. James*, 167 N.C. App. 504, 510–11, 606 S.E.2d 359, 364 (2004) (citation omitted). "The threshold question in any misappropriation of trade secrets case is whether the information obtained constitutes a trade secret[.]"*Combs & Assocs. v. Kennedy*, 147 N.C. App. 362, 369, 555 S.E.2d 634, 639 (2001). The NCTSPA defines a "trade secret" as:

> [B]usiness or technical information, including but not limited to a formula, pattern, program, device, compilation of information, method, technique, or process that: (a) Derives independent actual or potential commercial value from not being generally known or readily ascertainable through independent development or reverse engineering by persons who can obtain economic value from its disclosure or use; and (b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

G.S. § 66-152(3)

57.    The burden of proof is on the owner of the trade secrets to establish the prima facie case of misappropriation by introducing "substantial evidence" that the defendant: "(1) knows or should have known of the trade secret; and (2) has had specific opportunity to acquire it for disclosure or use or has acquired, disclosed, or used it without the express or implied consent or authority of the owner." G.S. § 66-155 (1999)).

58.    Defendants argue that AAF has not alleged its trade secrets with sufficient specificity to survive dismissal. (Defs.' Br. Supp. Mot. Dismiss 17–19.) The Court disagrees. AAF alleges that the TCOD is a proprietary program developed by AAF that contains data regarding AAF's and its competitors' products compiled, in part, through AAF's own internal testing and performance studies. The program calculates the costs of ownership of AAF's products as compared to its competitors' products based on the customer's operating parameters.  (VFAC ¶ 17.) AAF also alleged that the trade secrets at issue in this matter included, *inter alia*, information about prices AAF negotiated with its national accounts, tools that use proprietary algorithms to create custom quotes, reports created by AAF at its customers' facilities

which include identification of customers' current air filtration products, sizes, specifications, and other customer-specific issues, AAF's costs of goods sold from which AAF's profit margins can be determined, and detailed drawings and product specifications created by AAF for customers. (VFAC ¶ 18.) This description of the information at issue satisfies AAF's obligations to identify its trade secrets with sufficient specificity at this stage of the litigation.

59. Defendants also contend that AAF has not alleged that Defendants misappropriated its trade secrets. (Defs.' Br. Supp. Mot. Dismiss 19–20.) Again, the Court disagrees and concludes AAF has sufficiently alleged misappropriation.

60. First, AAF has alleged that Price knew of and had access to AAF's data bases containing its trade secrets (e.g., VFAC ¶ 35.) Accordingly, the first prong under G.S. § 66-155 is satisfied.

61. AAF has also pleaded that Price had opportunity to, and did, acquire AAF's trade secrets. AAF alleges that because Price deceived AAF about the fact he was going to work for Camfil, AAF did not terminate Price's access to its trade secrets, but instead continued his access until August 12, 2016. AAF would have terminated Price's access immediately had it known his true intentions. (VFAC ¶¶ 56–58.) AAF alleges that between accepting employment with Camfil and his final day of employment with AAF, Price accessed AAF's password-protected systems at least three times, and otherwise obtained trade secret information from AAF's employees. (VFAC ¶¶ 60–63.)

62. Finally, AAF alleges, albeit on information and belief, that Camfil hired Price for the purposes of gaining access to AAF's trade secrets and that Price has and continues to disclose AAF's trade secrets to Camfil. (VFAC ¶¶ 74, 84.)

63. The Court concludes that AAF has alleged that Price accessed its trade secrets under circumstances where he did not have AAF's consent, acquired AAF's trade secrets, and disclosed those trade secrets to Camfil. AAF's claim for misappropriation of trade secrets should not be dismissed, and Defendants' motion to dismiss the claim for misappropriation of trade secrets should be DENIED.

G. AAF has alleged a claim for unfair and deceptive trade practices.

64. AAF alleges that Price and Camfil's actions as alleged constitute unfair and deceptive trade practices in violation of the UDTPA. (VFAC ¶¶ 118–121.) The UDTPA declares unlawful "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce." G.S. § 75-1.1. To state a valid UDTP claim, a plaintiff must allege: "(1) an unfair or deceptive act or practice, or unfair method of competition, (2) in or effecting commerce, and (3) which proximately caused actual injury to the AAF or his business." *Combs & Assocs. v. Kennedy*, 147 N.C. App. 362, 373–74, 555 S.E.2d 634, 642 (2001). North Carolina courts "have long recognized that claims for misappropriation of trade secrets … may form the basis of a UDTP claim[.]" *South Fastening Sys. v. Grabber Constr. Prods.*, 2015 NCBC LEXIS 42, *28 (N.C. Super. Ct. Apr. 28, 2015) (citing *Drouillard v. Keister Williams Newspaper Servs., Inc.*, 108 N.C. App. 169, 172-73, 423 S.E.2d 324, 326-27 (1992)).

65.     AAF's misappropriation of trade secrets claim should survive Defendants' Motion to Dismiss. In addition, AAF alleges that Defendants engaged in other deceptive conduct surrounding Price's resignation from employment and continued access to AAF's trade secrets. Accordingly, AAF's UDTPA claim simiarly should survive dismissal. *Veer Right Mgmt. Group, Inc. v. Czarnowski Display Serv.*, 2015 NCBC LEXIS 13, *17–18 (N.C. Super. Ct. Feb. 4, 2015) ("Plaintiff's claim for unfair and deceptive trade practices must await further adjudication of the other claims upon which it is based."). Defendants' motion to dismiss AAF's claim for unfair and deceptive trade practices in violation of G.S. § 75-1.1 should be DENIED.

H.  Civil Conspiracy.

66.     "There is no independent cause of action for civil conspiracy. Only when there is an underlying claim for unlawful conduct can a plaintiff state a claim for civil conspiracy by also alleging the agreement of two or more parties to carry out the conduct and injury resulting from the agreement." *Toomer v. Garrett*, 155 N.C. App. at 483, 574 S.E.2d at 92. "A civil conspiracy is essentially an action for damages, and no action lies unless one or more conspirators actually cause damage." *Krawiec v. Manly*, 2016 NCBC LEXIS 7, *33 (N.C. Super. Ct. Jan. 22, 2016).

67.     AAF alleges that "Price and Camfil . . . conspired and agreed to . . . misappropriate AAF's trade secrets, to illegally use AAF's trade secrets, [and] to commit unfair and deceptive trade practices . . . ." (VFAC ¶ 123.)

68.     Since AAF's claims for misappropriation and unfair trade practices survive dismissal, these claims can serve as the requisite underlying torts for a civil

conspiracy claim. *Krawiec*, 2016 NCBC LEXIS 7, at *33–34. Accordingly, Defendants' motion to dismiss AAF's claim for civil conspiracy should be DENIED.

THEREFORE, IT IS ORDERED that Defendants' Motion to Dismiss Plaintiff's First Amended Complaint is GRANTED, in part, and DENIED, in part, as follows:

69.     Defendants' Motion to Dismiss Plaintiff's claim for breach of contract is GRANTED, and is dismissed WITHOUT PREJUDICE.

70.     Defendants' Motion to Dismiss Plaintiff's claim for breach of fiduciary duty against Price is GRANTED, and is dismissed WITH PREJUDICE.

71.     Defendants' Motion to Dismiss Plaintiff's claim for tortious interference with contract against Camfil is GRANTED, and is dismissed WITHOUT PREJUDICE.

72.     Defendants' Motion to Dismiss Plaintiff's claim for misappropriation of trade secrets in violation of the North Carolina Trade Secrets Protection Act is DENIED.

73.     Defendants' Motion to Dismiss Plaintiff's claim for violation of the North Carolina Unfair and Deceptive Trade Practices Act is DENIED.

74.     Defendants' Motion to Dismiss Plaintiff's claim for civil conspiracy is DENIED.

75.     Except as expressly granted above, Defendants' Motion to Dismiss is DENIED.

This the 26th day of June, 2017.

　　　　　　　　　　　　　　 /s/ Gregory P. McGuire
　　　　　　　　　　　　　　Gregory P. McGuire
　　　　　　　　　　　　　　Special Superior Court Judge
　　　　　　　　　　　　　　　for Complex Business Cases